*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

KEVIN ROBERT SMITH,

Defendant-Appellant.

UNPUBLISHED
March 19, 2020

No. 334692
Ingham Circuit Court
LC No. 15-001023-FC

## ON REMAND

Before: CAMERON, P.J., and METER and BORRELLO, JJ.

BORRELLO, J. (*dissenting*).

I respectfully dissent from the majority's approach to our Supreme Court's order remanding "this case to the Court of Appeals for reconsideration in light of *People v Harbison*, 504 Mich [230; 934 NW2d 693 (2019)]."[1] As I stated in my previous dissent in this case, I am convinced from my review of the record that the majority of both Detective Annie Harrison's and Dr. Stephen Guertin's testimony was introduced for the improper purpose of vouching for the credibility of the victims. See *People v Smith*, unpublished per curiam opinion of the Court of Appeals, issued August 14, 2018 (Docket No. 334692) (BORRELLO, J., dissenting), p 1. In my view, our Supreme Court's directive to reconsider this matter on remand in light of *Harbison* requires this Court to necessarily address Harrison's testimony as well as Guertin's testimony. I still conclude that the "failure by trial counsel to object to the numerous hearsay statements of Harrison and Guertin, coupled with counsel's failure to object to the majority of their improper vouching constituted ineffective assistance of counsel and denied defendant a fair trial." *Smith* (BORRELLO, J., dissenting), unpub op at 1. For the same reasons stated in my previous dissent in this matter, which I believe are harmonious with *Harbison*, I would reverse defendant's convictions and grant him a new trial.

---

[1] *People v Smith*, ___ Mich ___; 934 NW2d 213 (2019).

-1-

# I. *HARBISON*

In *Harbison*, which is the companion case in *People v Thorpe*, 504 Mich 230; 934 NW2d 693 (2019), our Supreme Court held that "examining physicians cannot testify that a complainant has been sexually assaulted or has been diagnosed with sexual abuse without physical evidence that corroborates the complainant's account of sexual assault or abuse *because such testimony vouches for the complainant's veracity and improperly interferes with the role of the jury*." *Thorpe*, 504 Mich at 235 (emphasis added). The defendant in *Harbison* had been convicted of various sex offenses against a child. *Id*. at 242-243, 249. At the defendant's trial, the pediatrician who had examined the complainant testified as an expert in child sexual abuse diagnostics that her diagnosis was "Probable pediatric sexual abuse." *Id*. at 243-245. The pediatrician explained that her information came from "taking a history from [the complainant] prior to the physical examination." *Id*. at 244. The pediatrician further indicated that the physical exam "did not show any acute or remote indications of trauma" and that she only found "a very small notch" on the complainant's hymen, which the pediatrician stated was "a non-specific finding." *Id*. at 245. The pediatrician explained:

> "A non-specific finding is a finding that we can see for many different reasons and is not specific to any type of trauma to the genital tissues. You can have small notches that occur from events like time events such as the bicycle accident or something of that nature. You can get small notches from children that use tampons. You can get small notches that are actually developmental in nature. So when you have a very shallow very small notch that is less than 50% of the width of the hymenal rim, those are considered non-specific findings." [*Id*.]

Our Supreme Court in *Harbison* concluded that the pediatrician's testimony constituted plain error requiring a new trial. *Id*. at 260-261, 264-266. The Court stated that the pediatrician's "expert opinion that [the complainant] suffered 'probable pediatric sexual abuse' is contrary to this Court's unanimous decision in [*People v Smith*, 425 Mich 98; 387 NW2d 814 (1986)]." *Thorpe*, 504 Mich at 260-261. The Court in *Harbison* reasoned that the pediatrician

> candidly acknowledged that her examination of [the complainant] showed no physical evidence of an assault. Her conclusion that [the complainant] suffered "probable pediatric sexual abuse" was based solely on her own opinion that [the complainant]'s account of the assaults was "clear, consistent, detailed and descriptive." This testimony clearly falls within *Smith*'s holding that an examining physician cannot give an opinion on whether a complainant had been sexually assaulted if the "conclusion [is] nothing more than the doctor's opinion that the victim had told the truth." An examining physician's opinion is objectionable when it is solely based "on what the victim . . . told" the physician. Such testimony is not permissible because a "jury [is] in just as good a position to evaluate the victim's testimony as" the doctor. [*Id*. at 261-262 (last alteration and ellipsis in original; citations omitted).]

The Supreme Court further concluded that "the most prejudicial aspect of [the pediatrician's] testimony was that she clearly vouched for [the complainant's] credibility." *Id*. at 263.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL TEST

As noted by the majority, this appeal involves defendant's claim that he received ineffective assistance of counsel. As I stated in my previous dissent:

> There can be little doubt that it is difficult to show that a conviction must be reversed based on a claim of ineffective assistance of counsel. In order to prevail on appeal, a defendant must demonstrate (1) that counsel's performance was deficient and (2) that the defense was prejudiced by counsel's deficient performance. *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d (1984), reh den 467 US 1267; 104 S Ct 3562; 82 L Ed 2d 864 (1984); [*People v* ]*Riley*, 468 Mich [135, 140; 659 NW2d 611 (2003)]. Satisfying the first prong requires a defendant to show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 US at 688; *Riley*, 468 Mich at 140. Satisfying the second prong requires a defendant to show that but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different. *Strickland*, 466 US at 694; see also *People v Trakhtenberg*, 493 Mich 38, 55-56; 826 NW2d 136 (2012). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 US at 694.
>
> A defendant making an ineffective assistance of counsel claim "must overcome the strong presumption that counsel's performance was born from a sound trial strategy." *Trakhtenberg*, 493 Mich at 52. However, "a court cannot insulate the review of counsel's performance by calling it trial strategy." *Id*. Trial strategy "in fact must be sound, and counsel's decisions as to it objectively reasonable." *People v Douglas*, 496 Mich 557, 585; 852 NW2d 587 (2014). When reviewing an ineffective assistance claim, "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged," and "[i]n every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Strickland*, 466 US at 696. [*Smith* (BORRELLO, J., dissenting), unpub op at 5.]

## III. IMPROPER VOUCHING OF HARRISON

In this case, the holding in *Harbison* admittedly applies most directly to Guertin's testimony, being that he was a specialist in areas related to pediatrics and child abuse who examined the victims and testified at trial as an expert in "child abuse." See *Smith* (BORRELLO, J., dissenting), unpub op at 18. However, contrary to the majority's findings, our Supreme Court did not order us to consider only Guertin's testimony. Instead, our Supreme Court's order was an instruction to address how *Harbison* would have affected this Court's analysis of any issue that was raised in the original appeal and on which *Harbison* has any bearing. The reason stated in *Harbison* for prohibiting examining physicians from testifying "that a complainant has been sexually assaulted or has been diagnosed with sexual abuse without physical evidence that corroborates the complainant's account of sexual assault or abuse" was that such evidence

-3-

"vouches for the complainant's veracity and improperly interferes with the role of the jury." *Thorpe*, 504 Mich at 235. Our Supreme Court in *Harbison* expressly stated that the "most prejudicial aspect" of this type of improper expert testimony was that the expert "clearly vouched for [the complainant's] credibility." *Thorpe*, 504 Mich at 263.

Because I have the same concerns about Harrison's testimony in this case, I find my previous analysis of this issue to again be implicated on remand by our Supreme Court's directive. In my prior dissent, I discussed caselaw from our Supreme Court and this Court stretching back to 1863, see *Evans v People*, 12 Mich 27 (1863); *People v Row*, 135 Mich 505; 98 NW 13 (1904); *People v Buckey*, 424 Mich 1; 378 NW2d 432 (1985); *People v Peterson*, 450 Mich 349; 537 NW2d 857 (1995); *People v Musser*, 494 Mich 337; 835 NW2d 319 (2013); *Douglas*, 496 Mich 557; *People v Walker*, 40 Mich App 142; 198 NW2d 449 (1972); *People v Parks*, 57 Mich App 738; 226 NW2d 710 (1975); *People v Shaw*, 315 Mich App 668; 892 NW2d 15 (2016), and arrived at the following conclusion:

> Thus, the rule that can appropriately be derived is that [it] is improper credibility vouching to allow a witness to testify about how he or she personally confirmed various elements of another witness's story or about why another witness's story is plausible or logical. Such testimony essentially connects the dots for the jury from evidence to conclusion via one witness's explanation of how another witness's testimony has been corroborated and, by extension, . . . the witness's veracity [is] confirmed. This kind of vouching testimony, rather than simply asserting that another individual told the truth, instead functions as an attempt to get the jury to substitute the witness's reasoning or personal investigation for the jury's own evaluation of another witness's credibility. [*Smith* (BORRELLO, J., dissenting), unpub op at 10.]

With that legal background in mind, I reproduce below part III of my prior dissent, *id*. at 10-17,[2] which analyzes Harrison's testimony in a fashion that I also find consistent with our Supreme Court's holding in *Harbison*:

> Applying the above legal principles to Harrison's testimony, Harrison improperly vouched for the credibility of DG and KG. As previously stated, Harrison conducted forensic interviews of both DG and KG during the course of investigating the allegations in this case, and she was called as a witness by the prosecution. During her direct examination, Harrison testified extensively about the nature of the forensic interview process and Michigan's forensic interviewing protocol, as well as her specialized training for investigating child sexual abuse cases and conducting forensic interviews. More specifically, she testified that Michigan's forensic interviewing protocol was developed "to assist us in the best techniques for interviewing children"; that she primarily investigates cases of child sexual abuse; and that in these cases, her "job is to thoroughly investigate and determine if it should or shouldn't be forwarded to the Prosecutor's office for

---

[2] The alterations in the following quoted text appear in the original.

review." The prosecutor also questioned Harrison on direct examination as follows:

> *Q.* I want to talk to you a little bit about forensic interviewing. Could you please tell the jury what is forensic interviewing? How does it differ from a normal interview?

> *A.* The goal for a forensic interview is to obtain a statement from a child in an unbiased developmentally appropriate neutral way, to assist in criminal justice and child welfare systems. What that really means, the word "forensic" is research-based or scientific. The State of Michigan developed the protocol based on research to help us as every day professionals on the do's and don'ts of how to interview a child, what the best practice is.

Harrison testified that she used the forensic interview protocol in her interviews of DG and KG in this case, although they were 18 years old at the time. Harrison also indicated that the initial phase of the forensic interview includes obtaining "a promise to tell the truth" from the interviewee. Additionally, Harrison explained that in a forensic interview, "we develop alternate hypotheses to look at different possibilities," that the alternate hypotheses are tested through questioning in the interview, and that "[i]t's a fact-gathering mission to look at all the possibilities, minimize suggestibility." Harrison stated, "There can't be any misunderstandings," and "[w]e need to make sure that we are getting the allegations correct, that we're looking to see what other possibilities are." According to Harrison, two alternate hypotheses were developed: (1) that there was a misunderstanding regarding whether there was actually a sexual touch and (2) that one of the involved parties was lying or that only one of the twins was abused. Harrison tested these hypotheses in her interviews of DG and KG. When the prosecutor asked Harrison if she was "able to eliminate any of the hypotheses or come to any conclusions," defense counsel objected "to any conclusions" on the ground that the prosecutor was "essentially asking her to determine what the truth was of what their allegations are." The prosecutor withdrew the question. However, shortly thereafter, Harrison testified that during the interview, she "look[s] for details of the act that would determine whether this is a sexual or non-sexual touch or whether it was a misunderstanding. The prosecutor followed up by questioning Harrison as follows without objection from defense counsel:

> *Q.* At the end of your interview, is your investigation complete if you eliminated certain alternate hypotheses, is that the end of your investigation?

> *A.* No.

> *Q.* All right. So are you able to eliminate alternate hypotheses, or any of the hypotheses during your actual interview process? Were you able to, in this particular case?

-5-

*A.*  Well, I mean, my job is to gather the facts.  So I, during the forensic interviews of both K[G] and D[G]—let's see how to answer that.  There are times in which there is a misunderstanding.  So then the case ends at that point.

After the forensic interview, the allegation, itself, which had been reported to me, was that [defendant] had sexually abused K[G] and D[G] [ ], that was still standing at the end of the interview.  So I continued the investigation.

*Q.*  You weren't concluding at the end that they had been abused, but rather that's where your investigation is now targeted?

*A.*  Correct.

*Q.*  Were you able to address the alternate hypotheses [sic] that it was a misunderstanding?

*A.*  Yes.

*Q.*  How did you do that?

*A.*  Well, they were clear—so I asked questions and they provided clear statements to me.  So it's not a misunderstanding at that point.

*Q.*  All right.  And how about the allegation that one was abused and not the other?

*A.*  They both provided clear disclosures.

*Q.*  At that point you were left with that it actually happened or that it was a lie, correct?

*A.*  Correct.

*Q.*  You are not able at that point to eliminate the lie?

*A.*  Well, a portion of it. So part of that could be, does the reporting source[5] have a motivation, or is the reporting source lying.  And so I develop questions during the interview as who is the first person that you told.  So if they told somebody prior to the reporting source, then that helps me with that.

Defense counsel did not object to the above testimony or otherwise renew his previous objection.  Harrison also testified that she needed to go the scene of the incidents described in a forensic interview "to see if that is possible" and to see "the viewpoint of witnesses" in order to "put [herself] in that situation to then get

-6-

additional leads or information that [she] can follow up and gather those facts to bring." Harrison would take photographs while at a given location. Although not specifically referenced by defendant in his appellate argument, Harrison also offered the following testimony during her direct examination, to which there was no objection and in which she essentially explained to the jury why she thought the description given by DG and her mother of the incident where defendant allegedly grabbed DG's chest made sense:

> *Q*. Again, we are using this photograph, just kind of a way as an example. But this photograph, in and of itself, does it provide for you and your investigation any corroboration of what you were told?

> *A*. Yes. I need to understand if what's being reported to me is possible. That's why, even if a crime had occurred decades prior, I always make it as a rule to go back to visit that scene, whether it's changed or evolved or not, whether the furniture is the same or different, or the walls are even different. I still need to go to document it to see what I find to see where the facts lead.

> *Q*. In this particular photograph, did it help you to understand ultimately how someone could be sitting on the couch and having another person in the room?

> *A*. Yes.

> *Q*. How so?

> *A*. The positioning of the furniture, of how, you know, the one chair is a little bit more forward. And then also the description of sitting close together. And when you see, you know, how couch cushions are divided. And then also the opportunity for the reflection. [The mother] had been reporting seeing a reflection. And as an investigator I didn't really understand that at that point.

> *Q*. So looking at People's 52, taking that photograph, did that help you understand what she meant better?

> *A*. I think what I see there is that reflections are possible. Again, at that point, I didn't know where the windows were in the home, or if reflections were possible in the home. So I still wasn't certain did she see the reflection in that TV or a different one, or a piece of glass or a different one. But I see that reflection is possible.

> *Q*. Thank you. So we just kind of did that as an exercise. Is that a good, a fair depiction of how you kind of run an investigation? You take the facts as you understand them, and then look for corroboration evidence, one way or the other?

*A.* Correct.

During Harrison's cross-examination, defense counsel questioned Harrison as follows:

> *Q.* Now, you have talked about there is instances where there is a delayed disclosure. Does delayed disclosure equate in any way with being a credible disclosure?
>
> *A.* I can't—
>
> *Q.* I guess the question I'm asking, because the disclosure is delayed, does that somehow make it, at least in your experience, more credible?
>
> *A.* I see cases—my job is to investigate and report the facts. But I see cases in both delayed and immediate disclosure. In both delayed and immediate disclosure, sometimes I screen them out. And in both delayed and immediate disclosure, sometimes I've turned them over to the Prosecutor's office.

Defense counsel also attempted to elicit inconsistencies between DG's and KG's forensic interview statements and their trial testimony by asking Harrison. For example, defense counsel questioned Harrison as follows:

> *Q.* How was it that K[G] made it clear to you how the pencil was used in this case?[6]
>
> *A.* When I said a clear statement, my alternate hypotheses [sic] was that this could have been a misunderstanding or a non-sexual touch. There was no doubt in my mind that she was describing sexual touch at the end of the interview. So that was what I meant by that.
>
> And then every detail, there is not an expectation to make every detail absolutely clear. That's not always possible.
>
> *Q.* But you would acknowledge that any—that there was no clarity with regard to D[G]'s statement to you—I'm sorry—K[G]'s statement to you about how, where, what, why, a pencil was used on her, was there?
>
> *A.* I disagree with what you're saying. I mean, we had a discussion. I asked questions about objects. She stated objects to me. I do think that that's clear.

On redirect, the prosecutor elicited further testimony, without objection from defense counsel that allowed Harrison to explain how her investigation corroborated DG's allegations:

*Q.* [Defense counsel] asked you about who you interviewed concerning the hot tub incident that we're talking about. And I believe your answer was, obviously, D[G], initially. And then you interviewed the Grandma and Grandpa [ ], Johnny [ ], Senior and D[G] correct?

*A.* Yes.

*Q.* What information did they provide that either—that helped you out with understanding D[G] and what she told you that had happened? And let me just, if I can, just jump to as the swimsuits.

*A.* Yes.

*Q.* So what did D[G] tell you about swimsuits in the hot tub?

*A.* She said that most of the time there isn't swimsuits in the hot tub. I could be wrong on most of the time. She said that the kids did not wear swimsuits in the hot tub. So I wanted to speak to an adult about that or another source to see if that is what the other source was telling me.

*Q.* What did you find out?

*A.* That they agreed with that statement.

*Q.* What about shirts, where to get shirts?

*A.* I asked the same question of Grandma [ ], where are shirts kept. He [sic] showed me the closet which, when I was there, was consistent with what information had been provided to me by D[G].[7]

*Q.* What about the fact that there had been a waterbed? What, if anything, about the waterbed in that room?

*A.* In Grandma and Grandpa G[ ]'s bedroom?

*Q.* Yep.

*A.* Yes. So when I was there, the furniture had changed. But she was able to describe to me what furniture had been like prior, you know, 13 years prior.

*Q*. And that was consistent, correct?

*A*. Yes.

*Q*. Why is that important in your investigation on sexual abuse cases?

*A*. For more than one reason. Again, it's to understand the scene to help create a picture of was this possible. It also is to test alternate hypotheses to see—look for consistency in witness statements.

*Q*. All right. The thing about the pond incident, near the dock, do you recall that incident with D[G]?

*A*. Yes.

*Q*. What did you do—these are ways to corroborate statements, fair to say?

*A*. Yes.

*Q*. What did you do to corroborate the statement about the pond incident, if anything?

*A*. It was mainly looking to see where the pond was, which house was the pond at, how close was the pond or far to the house. Where are seating areas. What does the dock look like. Basically observing, based on she had talked about the proximities of the dock, the heighth [sic] of the dock. I wanted to go there and document what the dock looked like.

*Q*. Okay. What about people's observations about the two of them in the pond at other times?

*A*. Right. There was more than one witness statement about hollering out to them or seeing them at a distance. And I wanted to be able to put myself in that position of where those people would be, and then how far is that to holler out, or how far is that to what could they see, what would be their vantage point.

Harrison specifically explained how, in her view, a photograph of the scene where defendant allegedly grabbed DG's chest demonstrated that the reflection reported by DG's mother was "possible." In essence, Harrison testified regarding her interpretation of the evidence and advocated that a particular conclusion be drawn by the jury—namely, that the story told by DG and her mother made sense and was believable—even though the jury was just as capable of evaluating whether the photograph supported the veracity of DG's and her mother's respective

-10-

testimony. By asking the jury to allow her own reasoning to replace that of the jury's in this regard, Harrison was improperly vouching for the credibility of DG and her mother. *Musser*, 494 Mich at 348-349; *Evans*, 12 Mich at 34; *Walker*, 40 Mich App at 144-145.

Furthermore, Harrison testified that the initial phase of a forensic interview includes obtaining a "promise to tell the truth" from the interview and that the interview was "a fact-gathering mission." She explained that she tested the alternate hypotheses (1) that the allegations involved a misunderstanding regarding whether there was a sexual touch and (2) that the allegations involved a lie. Harrison stated that she concluded that there was no misunderstanding because the victims "provided clear statements," and she also indicated that she was partially able to eliminate the notion that lying was involved. Harrison also heavily emphasized that the forensic interview process as "unbiased," "research-based," "scientific," and "neutral." This testimony served as clear vouching for the veracity of the victims' statements through painting the forensic interview process as a rigorous truth-testing tool on which the jury could rely to conclude that the victims' statements were believable. Harrison also invited the jury to rely on the quality of her investigation by testifying about how she corroborated the girls' statements through comparing them with the statements of other individuals she interviewed and noting the consistencies; Harrison expressly explained that her job was to "thoroughly investigate" cases to determine whether referral to the prosecutor's office was warranted. By so testifying, Harrison presented the forensic interview process and her own investigation as substitutes for the necessity of the jury to independently make its own credibility determinations, and she therefore improperly vouched for the credibility of both victims. *Musser*, 494 Mich at 348-349; *Evans*, 12 Mich at 34; *Walker*, 40 Mich App at 144-145. In short, under the guise of ill-described "scientific methods" she held herself out to the jury as a human lie-detector.

Moreover, although the prosecution argues that these statements were not hearsay because they were offered to show their effect on Harrison's investigation rather than for the truth of the matter asserted, the statements were still inadmissible because they were effectively part of Harrison's improper vouching testimony and were accordingly not offered for any relevant purpose. As our Supreme Court has explained, "even if an out-of-court statement is not offered for the truth of the matter asserted, the statement is not automatically admissible because the 'touchstone' of admissibility is 'relevance.' " *Musser*, 494 Mich at 354 (citations omitted).

To the extent that defense counsel's cross-examination of Harrison and defense counsel's trial strategy of generally attempting to undermine the credibility of prosecution witnesses could be understood to have made the steps of Harrison's investigation somehow relevant (which is what the prosecution appears to argue on appeal) the prosecutor at trial should have only elicited testimony from Harrison that would show that she followed proper investigative procedures without eliciting testimony that took the additional step of explaining how her investigative findings

-11-

demonstrated that the stories of other witnesses were believable. It is that additional step of essentially connecting the dots for the jury that constituted the improper vouching by Harrison.

Returning to defendant's ineffective assistance of counsel claim, defense counsel in this case failed to object to Harrison's improper vouching testimony set forth above. "[C]redibility contests are not uncommon in criminal sexual conduct cases," *People v Anderson*, 446 Mich 392, 407 n 37; 521 NW2d 538 (1994), cert den sub nom *Michigan v Anderson*, 513 US 1183; 115 S Ct 1175; 130 L Ed 2d 1128 (1995), and "the principle issue in cases involving criminal sexual conduct is the credibility of the complainant," *People v Beckley*, 434 Mich 691, 717 n 39; 456 NW2d 391 (1990) (opinion by BRICKLEY, J.). And while the instant case did not involve a credibility "contest" in the strict sense of the phrase because defendant did not testify, the credibility of the alleged victims and other prosecution witnesses was clearly of central importance in this case. Yet, despite the importance of witnesses' credibility and defense counsel's apparent strategy of trying to undermine the victim's credibility, defense counsel still did not challenge the clearly inadmissible vouching testimony by Harrison set forth above. Our Supreme Court has long recognized "the undue weight that jurors may be inclined to place on police officers' statements." *Musser*, 494 Mich at 363. In this case, there was no "sound" strategic reason for defense counsel's failure to object to Harrison's pervasive vouching, and defense counsel's performance thus fell below an objective standard of reasonableness. *Douglas*, 496 Mich at 585-586.[8]

---

[5] In this case, it appears that DG's mother would have been the "reporting source": Harrison testified that when she began working on this case, her "first contact had been with [the mother]" who had contacted law enforcement and whose "twin daughters had disclosed after their high school open house that they had been sexually abused for several years by their cousin, [defendant]."

[6] During KG's cross-examination, defense counsel had asked KG about portions of the description of the Allen wrench incident that KG gave during her forensic interview in which KG had stated that defendant was "look[ing] for something else, like pencils or just other things" but had not described defendant actually touching her with a pencil.

[7] It appears that the second reference to DG was intended to refer to the alleged victim in this case. DG and her grandmother have the same name.

[8] Defense counsel did object, on the ground of improper vouching, to the prosecutor's question asking Harrison whether it is typical for a victim to "disclose everything that happened to them in that initial interview." In making his objection, defense counsel stated that this question was asking Harrison to "give an opinion as to credibility." The prosecutor argued that the question was actually "based on her training and experience doing interviews," and the trial court stated that "[i]n essence, he is asking as she did this, what did you do." Defense counsel responded

to the trial court's statement by saying, "I don't have a problem with that. If he can restrict that, I won't have an objection." The trial court then overruled defense counsel's objection. However, defense counsel permitted the other impermissible vouching testimony described above to come in without any objection.

---

In my view, the holding in *Harbison* further supports the above analysis and conclusion.

## IV. IMPROPER VOUCHING OF GUERTIN

Turning to Guertin's testimony, I also reproduce below my prior analysis of defendant's ineffective assistance claim regarding his trial counsel's handling of this testimony. I believe the following analysis is entirely consistent with the holding in *Harbison*.

Dr. Guertin, a specialist in general pediatrics, pediatric critical care, and child abuse, testified as an expert in "child abuse."[9] Guertin conducted examinations of both victims. In response to the prosecutor's question about why it was still important to examine an individual when the alleged abuse did not occur recently, Guertin responded that "[i]t's what it always is, which is diagnosis and treatment." He explained that sexual assault or physical abuse can be diagnosed "years afterwards"; that it is important "to make sure that the perpetrator still doesn't have access to the child, even if she was a teenager"; that it is important to make sure that counseling is being provided,[10] and that there were still potential sexually transmitted infection issues.

---

[9] The prosecutor moved to qualify Guertin as an expert "in the field of sexual abuse against children," and defense counsel indicated that he had no objection." The trial court then stated that it was qualifying Guertin as an expert "in child abuse."

[10] Notably, Guertin clarified that "we don't provide the psychological counselling."

---

Guertin examined DG first. He testified that he took a medical history from her, during which she told him "that starting at an early age, sometime around five years or so, up through about age 15 or 16, that she had been raped and molested by a cousin," who she identified as defendant. According to Guertin, DG told him that the incidents occurred at her grandmother's home, that her mother had witnessed one incident of inappropriate touching, and that the other incidents were not seen by anyone else. Guertin's testimony also included recounting more specific allegations made by DG during the course of the medical history, including that defendant had done "a lot of rough fingering [and] touching" inside of DG's "private area," that defendant had put "the plastic part of a wrench that had been gnawed on or chewed on by a dog" inside her private area, that defendant had engaged in "genital to genital contact" with DG when she was five years old, that there was an incident in a pond at her grandparents' home where DG "had to manipulate [defendant's] penis" under the water, that defendant used pornography

-13-

with DG "while he was molesting her," and that defendant told DG that her family would be ruined or destroyed if she told anybody. Guertin also testified that he performed a physical examination of DG and that she had "two deep notches in her hymen." DG also informed Guertin that she was sexually active at the time of the examination.

According to Guertin, the potential for injury to the hymen is "higher in the pre-pubertal period" because the hymen is fragile and does not stretch at that stage of a child's development, and "the opening of the hymen in a pre-pubertal child, a child up through about age 10 to 12," is approximately 10.5 millimeters, which is smaller than the size of the average finger, erect adult penis, or the presumed size of a wrench handle. However, Guertin further explained that a sexually active individual "can certainly have evidence of sexual trauma from normal or volitional sexual activity[] [a]nd depending on how active they are, the incidence of that can be pretty high."

Guertin testified that in his opinion, DG:

gave a very clear history of being sexually molested over a period of years, beginning at a very early age, age 5, by a person named [defendant]. It included fondling, inserting the handle of a tool into her vagina, which was both painful and caused bleeding. She also integrated [sic] that there was at least some degree of penetration with his penis. On one occasion she was very young, age five. And she indicated that she was compelled to manipulate his penis as well. She was warned that discovery of this would ruin her family. And, also, he used pornography at least during some of these acts.

The physical examination showed two deep notches. One almost a transection, which clearly could support—which clearly supports an allegation of sexual abuse. As well, she was sexually active. And that you cannot necessarily separate out the findings that you see from abuse versus that volitional sexual activity. That's it.

Regarding KG's medical history, Guertin testified as follows in response to the prosecutor's questions:

*Q.* What was the history of K[G]?

*A.* Oh. She knew that she had come to the office to get a pelvic exam, because she had been molested. Actually she said a pelvic exam for being molested as a child. So I asked her: Well, were you or not. And her answer was: Yes. I asked if it happened only once or more than once. She said more than one occasion. I asked her how old was it when it started. She said five or six years old. I asked her when the last sexual conduct was. She said

-14-

probably 13 years old. I asked if anybody saw what happened to her. She said no. I asked her where these things took place. She actually listed a number of locations where she had been molested. She said her own home, in her bedroom, in her grandparents' house, the upper floor of her great-grandmother's house, and the swimming pool at [defendant's] parents' home.

*Q*. And what else did she tell you?

*A*. She indicated that nothing happened that involved his mouth. She indicated that the person who did this was [defendant], who was her cousin. She indicated that he did molest her with his hands, his fingers.

*Q*. Now, did she tell you anything else?

*A*. She said that he forcibly put a finger inside of her, and then it hurt her. But she didn't describe or remember bleeding related to those episodes. I asked if her [sic] if he did anything with his penis. Her answer was no. I asked her if he used anything else to touch her improperly. Her answer was the handle of a screw driver, an Allen wrench. And by that she meant the same thing. And with a pencil. I asked her if that hurt her. She said yes. I asked her if there was any bleeding with that, and she said yes. So she indicated that there was an event using a tool that had caused her both pain and bleeding. She didn't indicate that anything involved her anus or her own mouth or her own hands. And she didn't indicate that pornography was used with her.

I also asked her if he said anything to her.

*Q*. Okay.

*A*. And her answer was: He would tell me, this is normal. And you shouldn't be telling people because it's private.

*Q*. And K[G] was also sexually active, correct?

*A*. Yes.

Additionally, Guertin testified that his physical examination revealed that KG had evidence of injury to her hymen in the form of "a deep notch."

Guertin testified that in his opinion, KG:

also gave a strong history of being sexually molested by [defendant]. This included digital penetration and instruments being used to penetrate her vaginal area, which caused pain and bleeding. This

-15-

included the handle of a screwdriver. [Defendant] would tell her that the activity was normal, but that it needed to be kept private. The physical examination showed deep notch at the 5:00 position of the hymen, which confirms sexual trauma. Again, just as with her sister, and a sexually active person, you can't necessarily say it was from one or the other.

The prosecutor questioned Guertin on direct examination to clarify his opinion regarding whether the alleged victims' injuries were caused by sexual abuse or consensual sexual activity:

> Q.   Now, Doctor Guertin, you've testified and your assessment clearly shows it's difficult to pinpoint and say this is either from sexual abuse or this is from consensual adult sexual contact with these types of injuries, correct?
>
> A.  Correct.
>
> Q.  Is there—is one more likely than the other, can you even say that?
>
> A.  What you can say is you're more likely to suffer an injury if there is penetration across the plane of the hymen during the pre-pubertal period. But you still can get an injury. And especially if there is really frequent intercourse from post-pubertal sex. But just in terms of—in terms of the vulnerability of injury, if the sexual contact in the pre-pubertal period includes penetration across the plane of the hymen, then there is a higher probability from that in the pre-pubertal period to cause injury than in the post-period.
>
> Remember, the post-pubertal period, the opening of the girl's hymen is typically 12 to 25 millimeters. And they have a distensible hymen. So penetration simply is better tolerated there, and less likely to cause injury.
>
> Q.  All right. Thank you. So, finally, looking back on D[G]'s medical history, and her examination, are there any inconsistencies in her physical exam with the history that she gave you?
>
> A.  No. No. Both kids actually have evidence of sexual trauma. Both kids indicated not only painful, but bleeding sexual encounters that were molestation, episodes of molestation. And both kids also described being sexually active. So what we found is consistent with either one.
>
> Q.  With both children, correct?

-16-

*A.* Sure.

During cross-examination, Guertin further clarified this point, stating that

you can clearly get these injuries with a painful sexual molestation encounter that entailed bleeding, especially if it was in the pre-pubertal period. You can also get these findings from consensual sex, especially recurrent consensual sex.

Guertin testified that his conclusion that DG and KG had given "clear" and "strong" histories, respectively, of sexual abuse were based only on what they reported and the level of detail; he could not "tell you if they were telling [him] the truth."

On redirect, the prosecutor questioned Guertin as follows:

*Q.* Now. Is it—when you have a history of sexual abuse in this way, you indicated a clear history and a strong history, I think, for each girl, then you find those particular injuries. And in K[G]'s case she specifically says there is no accidental injury. What, if any, conclusion do you draw from that?

*A.* The conclusion that you can—

*Q.* Or diagnosis, I should say.

*A.* There are a number of conclusions you can draw. And they are in the assessment.[11] But the first one is a child gives a history of recurrent forms of sexual molestation. She is describing penetrated molestation on more than one occasion. She is not only is describing discomfort, but describes bleeding associated with at least one of these episodes.

---

[11] Guertin explained that the "[a]ssessment mainly just means my opinion."

---

When you examine her, you find that she has two tears in her hymen. Tears in the hymen are completely consistent with what she has said about episodes of penetrative abuse. By the way, they are also consistent with a history of recurrent volitional sexual intercourse.

The second child gives you a history of penetrative events, gives you a history of bleeding as well as pain. She has a single tear on her hymen. That tear in her hymen is completely consistent with what she has said.

She also admits to volitional sexual intercourse. So it could be from that, too.

But in terms of making a diagnosis of sexual abuse, if you have a clear or detailed history, I cannot tell you that it is the truth. I'm telling you that it is clear or strong or detailed. And you have physical findings that would be consistent with what is in that history. *I believe it is valid to conclude that the child was sexually molested. In this case both of them*.

*Q*. Again, that's based on your—it's consistent—with the history is consistent with their findings?

*A*. Right. The diagnostic process is history. Sometimes that's all you have—

*Q*. Sure.

*A*. —physical exam and any laboratory studies that you might do. And in this particular case the diagnostic process would lead you to a conclusion, that led me to a conclusion, frankly, that they have been molested.

*Q*. All right. And you weren't there, you can't know that for sure. You're just basing this on a procedure, correct?

*A*. Right. I can't know that for sure. (emphasis added).

On recross-examination, defense counsel questioned Guertin further on this point as follows:

*Q*. Part of the reason you don't know it for sure is because you don't know whether what they told you was true?

*A*. You can never know if it's the absolute truth, it's only partly true. So, yes, that's the reason why you don't absolutely know.

*Q*. So part of your conclusion is based on an assumption that what they're telling you is accurate, then that would be sexual molestation?

*A*. Right. When we talk to a patient we ask for history. We try to find out about symptoms and signs. *We take them at their word*. (Emphasis added).

Finally, Guertin also testified about memory-related issues for victims of child sexual abuse. Guertin testified during his direct examination that if something

happened to a person repeatedly over a prolonged period of time, it was difficult to remember the specifics about a particular incident. Subsequently, in response to a question from the jury regarding whether it was possible for memories to "blur together or get mixed up" when molestation happens over time, Guertin testified that:

> the actual experiences are remembered, but not the details of each individual event. I'm going to give you an example. Let's say on one event I get fondled in the pond, or I have to give somebody a hand job in the pond. Other things might have happened that day, but I remember that. Okay? Let's say six times somebody put a finger up my vagina. I can't remember on what day they did that and something else, necessarily. But I clearly remember having a finger put up my vagina. I don't know necessarily that it happened 10 times or five. But I clearly know that I got a finger put up my vagina over this period of time.

> So it's the same with what kids remember if many things have happened many times is broadly what happened to them. If you were beaten as a child, you can clearly remember being beaten and remember how horrible it was. But you can't necessarily remember which day or which beating was that horrible or which beating is this is [sic], what ended up happening to you or that you remember being beaten. It's the same way with this.

> So over time, let's say many things happened to a person many times. They remember what those physical things are that happened to them. They may not be able to remember how many of those things happened on any given day, how many of those things were just isolated events.

> That's the answer to that question.

> *The Court*: And Part 2 of [juror] number 8's question is: Given your response, is this blurring likely or common among victims?

> [*Guertin*]: It's common among victims who have repeatedly had things done to them, and/or more than one thing done to them. They remember what the physical acts are that occurred that happened to them. Some they may not tell you about because they are ashamed of them. So kids commonly are ashamed to tell you about being sodomized, and they think nothing about telling you about vaginal penetration. Just all depends on the kid.

> Even though there is blurring about each date, each of the event's cycle, if you will, there is not blurring overall about the

things that happened to them.  Now what they choose to tell you or not, that's up to the kid.

On recross-examination, defense counsel questioned Guertin as follows:

> *Q.*  Just one more question with regard to a jury question. Other than the information that D[G] supplied you with regard to a lot of rough fingering, the other acts of being—claims of being penetrated with a penis, having been subjected to having to perform a hand job, and the incident where a tool was used, those were only one incident per each of those categories that she described?
>
> *A.*  Right.  *She remembers those incidents*.
>
> *Q.*  There is no claim that there are repeated instances of those that would blur the details?
>
> *A.*  There is the claim by the child that forms of molestation began at age five or six, and ended at age 15 or 16.  I think that provides a significant opportunity to blur the details.  But it may not.
>
> *Q.*  Right.  But with regard to the specific acts that I described, the penetration with a penis, the allegation about a hand job, the allegation about a tool, there was only one incident that was claimed by that child of each of those?
>
> *A.*  Right.  *What she is describing, there are events that she clearly remembers*.  (Emphasis added).

Defense counsel did not move to strike any of these answers given by Guertin, despite the fact that neither was responsive to defense counsel's questions.

As an initial matter in analyzing defense counsel's performance with respect to Guertin's testimony, his testimony regarding the alleged victims' statements was inadmissible hearsay.  "Hearsay evidence is not admissible at trial unless within an established exception."  *People v Meeboer*, 439 Mich 310, 322; 484 NW2d 621 (1992), reh den sub nom *People v Conn*, 439 Mich 1242 (1992); see also MRE 802. Under the hearsay exception in MRE 803(4), "[s]tatements made for the purpose of medical treatment are admissible . . . if they were reasonably necessary for diagnosis and treatment and if the declarant had a self-interested motivation to be truthful in order to receive proper medical care."  *People v Mahone*, 294 Mich App 208, 214-215; 816 NW2d 436 (2011), lv den 491 Mich 908 (2012).  However, in *Shaw*, Judge Shapiro, writing for the majority, concluded that MRE 803(4) is not applicable when the examination "did not occur until seven years after the last alleged instance of abuse, thereby minimizing the likelihood that the complainant required treatment"; the complainant did not seek out the examining doctor but was instead referred by the police "in conjunction with the police investigation into the allegations of abuse by defendant"; and the complainant had seen a different

physician, who did not testify at trial, for gynecological care during the seven year interval. 315 Mich App at 675. A situation with such a long period of time between the alleged sexual assault and the examination differs markedly from a situation where an examination is conducted within a relatively short time after the alleged sexual assault occurred. See, e.g., *People v Garland*, 286 Mich App 1, 9; 777 NW2d 732 (2009) (concluding that the "victim's statements to the nurse were reasonably necessary for her treatment and diagnosis" where the victim went to the hospital for medical care and was examined on the same day as the sexual assault).

In this case, there was also a period of approximately five years or more between the last alleged incident of sexual abuse and Guertin's examinations of DG and KG. Moreover, Harrison testified that she referred DG and KG to Guertin after their forensic interviews, and DG testified that she had previously seen gynecologists and had disclosed the sexual abuse to someone at Planned Parenthood at some point before her examination with Guertin occurred. Although Guertin testified that he examined DG and KG for purposes of medical treatment that does not mean that the examinations were actually for medical treatment for purposes of MRE 803(4); an expert witness cannot testify to a legal conclusion. *People v Drossart*, 99 Mich App 66, 75; 297 NW2d 863 (1980) ("[I]t is important that the expert witness not be permitted to testify about the requirements of law which apply to the particular facts in the case or to phrase his opinion in terms of a legal conclusion."). Guertin's examination was not reasonably necessary for medical treatment but was instead aimed at furthering the investigation. Therefore, Guertin's testimony regarding the alleged victims' statements was inadmissible hearsay because it did not fall within the hearsay exception of MRE 803(4). *Shaw*, 315 Mich App at 675.

Moreover, Guertin also impermissibly vouched for the credibility of DG and KG through his testimony. In stating his expert opinion, Guertin testified that DG "gave a very clear history of being sexually molested over a period of years, beginning at a very early age, age 5, by a person named [defendant]." Guertin then immediately continued by recounting several of DG's specific allegations against defendant. Guertin also testified that in his expert opinion, KG "gave a strong history of being sexually molested by [defendant]" and then immediately continued by recounting specific allegations made by KG against defendant. Furthermore, although Guertin acknowledged that he could not actually tell if DG and KG were telling the truth, he also testified that his conclusion that DG and KG had given "clear" and "strong" histories, respectively, of sexual abuse were based only on what they reported and the level of detail in their accounts. Guertin further opined that when these histories were considered along with his findings of physical injury that was equally consistent with penetrative abuse as well as consensual sexual intercourse, he concluded that it was "valid" to conclude that DG and KG were "sexually molested." Guertin also explained memory-related issues and then affirmatively stated that the incidents described by DG were what she remembered.

By repeating the alleged victims' statements in the context of stating his expert opinion, Guertin went beyond merely recounting their medical history and

instead imbued the allegations with the authoritative weight of a final conclusion by an expert. Essentially, Guertin testified that he found the alleged victims' stories credible. When understood in this light, Guertin's other testimony that he could not be certain that DG and KG had told him the truth seems somewhat disingenuous. As our Supreme Court has explained with respect to expert testimony in child sexual abuse cases,

> Given the nature of the offense and the terrible consequences of a miscalculation-the consequences when an individual, on many occasions a family member, is falsely accused of one of society's most heinous offenses, or, conversely, when one who commits such a crime would go unpunished and a possible reoccurrence of the act would go unprevented-appropriate safeguards are necessary. *To a jury recognizing the awesome dilemma of whom to believe, an expert will often represent the only seemingly objective source, offering it a much sought-after hook on which to hang its hat.* [*Peterson*, 450 Mich at 374 (emphasis in original; quotation marks and citation omitted).]

Furthermore, Guertin's opinion that it was valid to conclude that DG and KG had been sexually molested constituted impermissible vouching because that conclusion was not supported by objective medical evidence. Our Supreme Court has stated that even in the sexual assault context, it is "well-established that expert opinion testimony will not be excluded simply because it concerns the ultimate issue." *People v Smith*, 425 Mich 98, 101,106; 387 NW2d 814 (1986), citing MRE 704.[12] However, the examining physician's opinion must be based on objective evidence "within the realm of his medical capabilities or expertise," or else it is merely an improper opinion on the complainant's veracity. *Id*. at 112-115 (holding that a doctor's opinion that a complainant was sexually assaulted should not have been admitted where it was based on the complainant's emotional state and self-reported history rather than on any "findings within the realm of his medical capabilities or expertise as an obstetrician/gynecologist" because this expert opinion had the effect of being an "assessment of the victim's credibility").

---

[12] MRE 704 provides: "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

---

In *People v McGillen #2*, 392 Mich 278, 284-285; 220 NW2d 689 (1974), our Supreme Court held that a doctor's opinion that penetration had occurred was improperly admitted where "the prosecutrix admit[ed] that a second rape occurred subsequent to the charged offense, any testimony the doctor may give is irrelevant and immaterial especially in view of the length of time that intervened between the alleged act and the physical examination." That case involved defendant's trial for the first alleged incident of sexual assault, but the doctor had only conducted a

physical examination of prosecutrix approximately two weeks after that incident; during that two-week interval, the prosecutrix was sexually assaulted a second time. *Id*. at 281-282. In reaching its holding, our Supreme Court reasoned as follows:

> By accepting as fact the prosecutrix's factual history and then testifying that in his expert opinion the medical examination supported and was consistent with that history, he is lending his medical opinion to support a claim made by the prosecutrix that is beyond the realm of his medical capabilities and expertise. The doctor is not a qualified expert on the question of whether or not the prosecutrix was raped by the defendant on the alleged date. [*Id*. at 285.]

> In this case, Guertin testified that his physical examination revealed injuries to the hymens of DG and KG that he opined were equally consistent with being caused by childhood sexual abuse or consensual sexual activity. The medical histories of both DG and KG indicated that each girl was sexually active at the time of the examinations and that each girl alleged instances of childhood sexual abuse. To the extent that Guertin opined that the injuries could have been caused by either the alleged abuse or consensual sexual activity that was part of DG's and KG's medical histories, this opinion was supported by objective medical evidence in the form of his physical findings and medical expertise. Guertin also adequately explained the justification for his conclusion that sexual abuse during the pre-pubertal stage was a "more likely" cause, based on his medical knowledge of female anatomy and development. However, Guertin had no objective medical basis from which to conclude that the "valid" conclusion was that DG and KG had been "sexually molested." By choosing one cause over the other without an objective medical reason, Guertin went beyond the scope of what [] his medical expertise actually allowed and ventured improperly into the realm of inadmissible lay opinion about the credibility of the alleged victims allegations against defendant. *Id*. This was also improper vouching. *Musser*, 494 Mich at 349; *Peterson*, 450 Mich at 352; *Buckey*, 424 Mich at 17. [*Smith* (BORRELLO, J., dissenting), unpub op at 18-27 (alterations in original).]

I would only add to the above analysis that Guertin's testimony was improper under *Harbison* for the same reasons stated above. See *Thorpe*, 504 Mich at 235 ("[E]xamining physicians cannot testify that a complainant has been sexually assaulted or has been diagnosed with sexual abuse without physical evidence that corroborates the complainant's account of sexual assault or abuse because such testimony vouches for the complainant's veracity and improperly interferes with the role of the jury."). The improprieties in Guertin's testimony closely parallel those of the pediatrician's testimony that was found to be improper in *Harbison*. *Id*. at 244-245, 260-266.

Hence, because Guertin's improper vouching testimony was contrary to the holding in *Harbison*, and for "the same reasons that defense counsel's performance was deficient with respect to his failure to challenge Harrison's vouching testimony, defense counsel's performance was also below an objective standard of reasonableness with respect to his failure to challenge Guertin's

vouching testimony. *Douglas*, 496 Mich at 585-586. Like police officers, expert witnesses are prone to having their statements given a greater degree of weight by juries. *Peterson*, 450 Mich at 374." *Smith* (BORRELLO, J., dissenting), unpub op at 27.

## V. PREJUDICE

Turning next to the prejudice prong under *Strickland*, defendant must show that there is a reasonable probability that but for counsel's deficient performance, the outcome of the trial would have been different. 466 US at 694. A reasonable probability is one that is "sufficient to undermine confidence in the outcome," and this standard does not require defendant to show that the outcome was "more likely than not" altered. *Id*. at 693, 694. "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id*. at 694.

The instant case admittedly presents a closer question of prejudice than *Douglas* or *Shaw*. In both of those cases, there were no third-party witnesses to the alleged abuse and little or no physical evidence. *Douglas*, 496 Mich at 567; *Shaw*, 315 Mich App at 677. In this case, there were no eyewitnesses to any of the incidents involving penetration of DG or KG, but there was testimony that defendant had been seen on multiple occasions grabbing and poking DG and KG. Her mother also witnessed the incident where defendant grabbed DG's chest on the couch.

However, even in the context of CSC-II, which is based on "sexual contact," the prosecution must still prove that the intentional touching could "reasonably be construed as being for the purpose of sexual arousal or gratification, done for a sexual purpose, or in a sexual manner for" revenge, inflicting humiliation, or out of anger. MCL 750.520a(q); MCL 750.520c(1). The jurors in this case clearly did not believe all of the allegations that were made: they acquitted defendant of one charge and could reach a unanimous verdict on another charge. Considering the heightened weight that juries tend to give police officers and expert witnesses, *Peterson*, 450 Mich at 374; *Musser*, 494 Mich at 363, and the amount of vouching and hearsay evidenced admitted without objection, it is reasonably likely that that the improper vouching by Harrison and Guertin could have convinced the jury that at least some of the allegations were credible and, with respect to the CSC-II conviction, that defendant touched DG for a sexual purpose as opposed to some other purpose.

Such a conclusion is not mere conjecture. See *Strickland*, 466 US at 693 ("It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."). Both Harrison and Guertin were the very witnesses our Supreme Court alluded to in *Peterson* when they held: "To a jury recognizing the awesome dilemma of whom to believe, an expert will often represent the only seemingly objective source, offering it a much sought-after hook on which to hang its hat." *Peterson*, 450 Mich at 374. While it is important not to

-24-

minimize the significance of improperly touching another person in a sexual manner, it is also worth noting that the instant case also involved a substantial amount of "other-acts" evidence related to incidents that defendant would have allegedly committed when he was a minor as young as 12 years old. These other acts were put into evidence in order to convince the jury to convict defendant of criminal offenses that he allegedly committed as an adult. Presuming that there was no error in admitting all of this other-acts evidence,[13] it would still be reasonable for jurors to potentially ascribe a different amount of weight or different purposes to the acts of a 12 year old then they might to the acts of an adult, unless there was evidence suggesting that they should do otherwise. Accordingly, the wrongful admission of vouching testimony given by a police detective and a medical expert, who opined that DG and KG had been "sexually molested," could have reasonably made a difference in how the jury perceived the alleged victims' claims and the intent of any acts they believed defendant committed. See *Peterson*, 450 Mich at 374; *Musser*, 494 Mich at 363; see also *Douglas*, 496 Mich at 580 (noting that "[w]hile credibility contests are not uncommon in criminal sexual conduct cases, the wrongful admission of corroborating testimony on either side could tip the scales and result in harmful error") (quotation marks and citation omitted).

---

[13] See, e.g., *In re Kerr*, ___ Mich App ___, ___; ___ NW2d ___ (2018) (Docket No. 335000); slip op at 2-4 (holding that MCL 768.27a, which permits the prosecution in a criminal case involving a listed offense against a minor to introduce evidence that the defendant committed another listed offense against a minor, also applies in juvenile-delinquency trials but is still subject to the specific application of MRE 403 set forth in *People v Watkins*, 491 Mich 450; 818 NW2d 296 (2012)). "Listed offense" means "that term as defined in section 2 of the sex offenders registration act . . . ." MCL 768.27a(2)(a).

---

\* \* \*

. . . I find the decisions in *Douglas* and *Shaw* applicable. The instant case involved a situation where the credibility of the alleged victims was of central importance, and seemingly objective witnesses with the authoritative positions of police detective and medical doctor testified in a manner that vouched for the believability of the alleged victims' stories. For the above reasons, there is a reasonable probability that if defense counsel had objected to this vouching testimony and prevented it from being admitted, the outcome of defendant's trial would have been different and the jury would not have convicted him as it did. The failure by trial counsel to object to the hearsay statements provided by Harrison and Guertin allowed those statements to be considered by the jury. The failure of trial counsel to allow them to present their testimony, again without objection, in a manner best described as human lie detectors, undermined the credibility of the verdict and denied defendant a fair trial. See *Peterson*, 450 Mich at 374; *Douglas*,

496 Mich at 586-588; *Shaw*, 315 Mich App at 677-678. [*Smith* (Borrello, J., dissenting), unpub op at 27-30 (alterations in original).]

Thus, as I stated previously, I would reverse defendant's convictions and remand this matter to the trial court for a new trial.


/s/ Stephen L. Borrello